Mayors who are going to be arguing this matter, please approach the podium and please state your names for the record. Good morning, Your Honor. My name is Chris Lord and I represent the Petitioner Appellate. Okay. Good morning, Your Honor. My name is Adam Altman and I represent the Respondent Appellant. Okay. Just as a reminder, the microphone doesn't amplify. It only takes the recording. So please keep your voices up loudly and clearly. And 15 minutes apiece. Time for rebuttal. Yes, Your Honor. I'd like to reserve 90 seconds for rebuttal. Okay. All right. Before we proceed, I do want to indicate that we did inform the Illinois Attorney General's office. We provided them with notice of the case and all arguments that we're going to be proceeding today. The clerk's office, our clerk's office, I've confirmed with the Attorney General's office, we're not going to be intervening or otherwise participating in this case. So I just wanted to make sure I put that on the record. Also, I know at the trial level, there were some references to profanity, obscenity, and crude language, but we don't need any of that there. We got it. No, Your Honor. All right. Okay. Particularly with those of tender age. All right. We're ready to proceed? I am, Your Honor. Okay. Good morning, Your Honors. May it please the Court. Counsel. Your Honors, this morning we are challenging the constitutionality of Illinois Stalking No Contact Order Act. And we're asking that the Court reverse the trial court because the Stalking Act is unconstitutional both on its face and unconstitutional as applied to the facts of this case. In addition to that, this Court should reverse the trial court because its decision ran afoul of the manifest way that the evidence. Well, Your Honor, this Court and some other courts around the state have already addressed this issue with regards to the statute that the conduct or the language that's been alleged here is actually, based on the statute, unconstitutional? I think the language here is unconstitutional, Your Honor. And I think the factual circumstances of this case are a little somewhat unique. And I think if we discuss the facts for a few minutes, it might help inform the Court as to the legal posture here. Well, we're familiar with the facts. The question I have is at the trial level, the trial judge indicated that the conduct of your client did consist of monitoring, did consist of surveillance, which is actually language that's in the statute. So how is his conduct in terms of monitoring and surveilling here constitutional? Well, Your Honor, I think the problem here is that, and this is what the Illinois Supreme Court pointed out in People v. Belford, and indeed this Court did as well, that you can't necessarily isolate conduct from speech, that the two often run together. And a court should not make a ruling that, you know, trying to separate the two and one would be violative of the statute and one wouldn't. And I think that's a perfect illustration of why this statute is so overbroad in this case, because... Well, Ralliford talks about the communications to or about, right? I can't hear you. Because Ralliford dealt with communications to or about, correct? Yes, Your Honor. And they found that was unconstitutional. Yes, Your Honor. Those words. Yes, Your Honor. And then they went on to analyze to see whether or not the conduct involved in Ralliford otherwise could be found violative of the statute. Yes, Your Honor. Should we not also do that same type of analysis? I don't think there's a lot of argument that could be made that the communications to or about in this statute are constitutional. And I think the FLE acknowledges that. I'm sorry, Your Honor. You're saying that... So you're trying to say that we need to look at the conduct in the words and combine them. But that's not quite what the Ralliford court did. They said communications to or about was unconstitutional, correct? Yes, Your Honor. And then they went back and said, is there any other conduct involved here that otherwise falls within the CIPER stocking and the stocking statute? Should we not be doing that same analysis here? Well, I think, Your Honor, that the speech here and the conduct, if you will, are so intertwined here that you almost cannot separate them. And I think even if the court were to try to do that, it would still have a constitutional problem. Well, the point here is what I understand the client was picketing or had a difference of opinion with regards to the employees, with regards to the business and how the business was conducted, all right? Now, the question is in terms of the language, there's reference here to how much they spent on their vehicle. How is that relevant? I mean, what is the sign with regards to the type of vehicle that they drive and how much they spent on the vehicle have anything to do with his First Amendment right? Well, Your Honor, I think that an agreed consumer has a right to speak out against not only a corporation or some other business entity, but they can also speak out against the leadership, the board of directors, the management, the operators of the company, and the various... But how does the reference to the vehicle have anything to do with the leadership or the way the business is conducted? Well, Your Honor, I think my client was pointing out that throughout this case, there were situations where his position was that the Seagulls were holding themselves out as the agreed party here, that they were in a financially dire situation or this case was somehow legally, I'm sorry, financially constraining them. And Mr. Barnett was... Isn't that issue here fraud? The client was saying that he was a victim of fraud because the product that he wanted wasn't what it turned out to be.  And my client's concern, well, the dispute did arise because of a flaw in the product design that Mr. Seagull was handling for Mr. Barnett. And Mr. Barnett did what any reasonable agreed consumer might do. He did try to settle the situation directly with the Seagulls. And when those efforts failed, he sought legal remedies. And contemporaneous with seeking legal remedies, he also began protesting Bud Engineering and the Seagulls as Bud Engineering's operators. And Mr. Barnett protested Bud Engineering through two primary means. He was picketing at the residence, which, of course, this court has discussed already. But he also created this website, which was an answer to a website that Mr. Seagull had originally created. And also, I think that the fact that Mr. Barnett was picketing at the Seagulls' residence, which is where Bud Engineering is headquartered, they run the business out of their home. And their hours were posted, nine to five. So how is... Two to five. Two to five? Yes. Okay, two to five. Three hours. So how is it on holidays, on weekends, and after business hours, how is that relevant? And how do you counterpose that with his First Amendment rights, that he's expressing his displeasure with the product? Yes, Your Honor. Well, I think the location of the picketing and the hours, as you mentioned, I think that poses two important points here. First of all, Mr. Barnett knew that he was picketing in a residential neighborhood in the village of Skokie. He knew that that might pose some constraints on his free exercise of speech that he might not otherwise face in a more commercialized setting. And he took a prudent step by contacting the general counsel for the village of Skokie. And the general counsel gave Mr. Barnett his assurances that because the Seagulls were operating a business out of their home, that Mr. Barnett was within his rights to picket in front of the residence. And the location is also important because I think that but for the fact that the Seagulls lived at the location, I don't think this case ever would have materialized. In other words, if he were picketing down the street here at LaSalle and Randolph, say, outside a building, if that's where ButtEngineering were located, nobody would have batted an eye at him picketing outside the building. Well, aside from the location, what about the time and the dates? Holidays, after hours, and on the weekends? No one that's going to be employing their services is going to be coming around their offices on the holidays or on the weekends or after hours. Sure, Your Honor. And we acknowledge that the government is free to impose limitations on the time, place, and manner of protected speech, but they also have to leave alternative channels of communication open. And here the trial court foreclosed alternative channels of communication because, well, just to backtrack, first of all, the village of Skokie did not impose any limitations, at least that Mr. Barnett was aware of, as to the time, place, and manner of his picketing. And in addition to that, Mr. Barnett, throughout the case, his picketing activities have been characterized as, you know, I think in the briefs, opposing counsel mentioned that Mr. Barnett was there some 80-plus times. And while that may be true, Mr. Barnett also had close ties to the community. He was in this neighborhood frequently, and he would stop by from time to time when he was in the neighborhood. And this was not our – we're not talking about hours-long events here. We're talking about he would be there sometimes as short as five, ten minutes. And he may – on some days I believe he did appear more than once for brief periods of time. So how long should this course of conduct continue? If we followed your argument, when does it end? Is it going to go indefinitely? Well, Your Honors, I think time would eventually be on the civil side. I think Mr. Barnett would not be able to picket forever. But I don't think that anything that he did here was violative of Illinois law. I'm sorry. Weren't there some allegations that he said sexually explicit things to an 80-plus-year-old woman, other than just saying that you're – they're bad business practices, but he offended an 80-something-year-old man and woman on more than one occasion? Yes, Your Honor. And while those statements, which, by the way, Mr. Barnett – The judge has to make the decision as to who's telling the truth. So if the judge believed that the people in their 80s were telling the truth, is that constitutionally protected speech? Well, Your Honor, while the speech may be morally offensive, I don't think it rises to the level of offending the law here. You don't think it caused emotional distress to somebody in their 80s to talk about them? I forgot. I don't even want to repeat what I read. Your Honor, as I said, we acknowledge that it was offensive language, and I think that it may cause emotional distress to some people. But on the record here, on the factual circumstances of this case, I don't think that it did cause emotional distress. Excuse me. And also, the test under the statute is an objective one. It's not a subjective test. It's the reasonable person test. But either through an objective or subjective standard, I don't think that the language there was – the commentary was even offensive of this overbroad language in the statute. And I think one of the other issues here, besides the picketing, a very important issue here is that Mr. Barnett created this website, which I mentioned before was an answer to a website that Mr. Segal had originally created. And that was really his primary means of speaking out to the public about Bud Engineering. On this website, which is in the record before this Court, the contents of the website, that is, Mr. Barnett posted – he posted bits and pieces of legal filings between the parties. He posted links to magazine articles. He posted information about the Illinois Professional Engineering Act, other pertinent information that a reader might find interesting. And Mr. Segal's website was geared toward engineers, people in the engineering community, and that's how Mr. Barnett was trying to tailor his website. But the trial court enjoined Mr. Barnett from using his website to speak out against Bud Engineering. And I think that makes this case really a prime example of why this statute is so overbroad, the language in Section 10. I have a question about the legal proceedings here. I think it's footnote number two in your brief. You make reference to the fraud case and that the fraud case was dismissed. But it appears that there's a different court number cited in your footnote. When was the fraud case dismissed? You're talking about Judge Malloy. I don't know the time, the year that the fraud case was dismissed. Without reference to my notes, I don't have them in front of me. But I'm not sure of the relevance of Your Honor's question with regard to whether it's relevant. Well, it's relevant in terms of, I mean, your client, again, is alleging fraud, and he filed two fraud cases and they were both dismissed with prejudice. So I was just trying to determine what was the timing of the one that you referred to in your footnote because that doesn't appear to be in your footnote in terms of when it actually got dismissed. Well, Your Honor, if you're asking about the timing of the fraud case vis-à-vis Mr. Barnett's picketing and his maintenance and publishing of the website, I don't think one should really inform as to the other because Mr. Barnett has a right to speak out against fraud engineering regardless of any legal action that is ongoing. And that's what he was trying to do here. But that's my question. It wasn't ongoing because both of the fraud cases that your client brought before their trial court were dismissed. That's correct, Your Honor, but there was still the underlying dispute. One, that Mr. Barnett had not received the product that he was expecting from the Siegels. But his bigger complaint was that the Siegels had held out themselves, but engineering I should say, as a professional engineering company. And in fact, Mr. Siegel was not a licensed engineer. And that was Mr. Barnett's biggest issue here. And that was ongoing regardless of any litigation between the parties because indeed Mr. Siegel continued his product design company by engineering. All right. We're going to do some time for rebuttal, but do you want to sum up? Yes, Your Honor. I think Relaford controls this case. It's the criminal analog of the constitutionally offensive language here. I think the language is too overbroad. And as the Supreme Court theorized in Relaford, it could prescribe even political speech. And here we're, of course, not dealing with political speech, but we're dealing with something that could be just as important, and that's a consumer's right to speak out against a corporate entity and its directors and its operators. And for those reasons, Your Honor, and everything else that we enumerated in our briefs, we ask the Court to hold the statute unconstitutional and to reverse the trial court. Thank you. May I ask a question? Is there anything currently pending in the circuit court regards any violation of the no-stalking order? There is not, not related to this case, and I'm not aware of anything outside of this case between these two parties. Thank you, Counsel. Thank you. Thank you. Thank you. If it pleases the Court. Counsel, can you give us your name again? I didn't hear you. My name is Chris Lord, and I represent the Petitioner, Mr. Bernie Siegel, who is in court this morning, as is the protected party, Ms. Maria Siegel, sitting in the front row there. Counsel, before you proceed, could you address the issue about the website? Why is it or is it not problematic here? Well, I think it's problematic because in the cases that have been cited in Illinois dealing with speech as part of a course of conduct that constitutes harassment, they've enjoined and they've found violative of, you know, stalking statutes the whole course of conduct. And they find that in Hemby, no, excuse me, and find that in Pister and in McNally where the court didn't just isolate out the speech component of the harassment behavior and said, you know, you can continue on with the speech, but the rest of your harassment behavior has to be enjoined. But they said that was the nature of the speech, though, that it was threatening or harassing. Right? In those cases, that's the language that they use. Right. And we have to reexamine them a bit because of Relaford, don't you think? Correct. I think after Relaford, and I fully agree that it's very likely that a court addressing this court, addressing that provision, the communications to and about, will find that unconstitutional. Okay? But I think you go on and make the determination that the Relaford court did, which is you look at whether or not, in this case, the manifest way that the evidence supported the court's determination that not only that the conduct was harassing, but she enjoined the website as well, making a factual determination, which this court has to respect. What factual determination did the judge make when she entered that injunctive release, if you will, saying no electronic communication, whatever? I'm sorry. It's not the exact language, but something like that. Well, my belief is that she did not make an express factual determination, that it was subsumed within her determination that his entire course of conduct was harassing and violated by the stopping statute. Of course, you don't get relief unless you make that finding. Correct. But the relief appears, to me, it would have some, how would that be enforced without possibly violating what is now on our standards under Relaford? I mean, it says no communication, right? What is the exact? Are you talking about the language of the statute? No, I'm talking about the language of the stalking order that was put in place here. Well, I think you would enforce the stalking order the same way and determine whether or not any conduct, including speech that is incidental to conduct, is violated the stalking act. You look at all the facts and circumstances. But the relief here, I'm talking about just the specific relief, about telling Mr. Siegel that he can make no, I'm looking for the language. I'm afraid I know what language you're referring to, and it joins Mr. Barnett from posting his website, and the website has to be taken down. It was broader than that. It was broad. But like I said, I think that when you look at that, and your question was to whether or not, how do we determine, how do we enforce that directly? And I think what you do is you do like any court does when it's asked to look at whether or not speech that's incidental to stalking behavior is violated by the act or of an existing order. The order specifically says, I'm sorry to interrupt, but the order specifically says no electronic communication regarding the petitioner and Rita Siegel by the engineering. And then, you know, looking at Feister and McNally, where's the disturbing communication in this website? And in those cases, it was conduct along with the communication. So where is that in this case? If you're going to isolate just the communication, just the electronic communications, then I believe you're correct. There is, you know, your analysis. But if your analysis only stops there, what you do is you allow people who are stalkers, people who are harassing people, to avoid these statutes. This is part and parcel of the conduct that he was engaged in over a period of six years, where he appeared in front of my client's home more than 75 times, excuse me, more than 80 times over 75 days where he wished them dead, where he suggested they engage in vile sexual behavior, where he appeared at all times of day and night. When you arrive home and your stalker is sitting in the dark in front of your home, this is, as a Rutherford quote said, this is traditionally understood stalking behavior. How does the analysis connect that to the website? Because that type of conduct and communication does not appear on the website according to the record. You're right. It does not appear on the record. And what you do, and I'm going to go back to it, you can't separate it out from the rest of his conduct. This is part of a course of conduct that was intended to harass my clients. It's not an isolated incident. It's not like this was the only thing that he was engaged in. It wasn't like he put up this website and then didn't do anything more to harass my clients. This was intended to harass them. Now, this website was up much longer than, the opposing counsel said it was there to respond to my client's website. Well, it's not on the record, but my client's website has been down for years. And those legal filings that are included in that website, well, those all go to the case that was filed, the fraud case, the Amarid v. Bud Engineering case that Judge Mulroy entered a directing finding in in 2014. So this was up for a long period of time afterwards. It has totally served whatever purpose he says it, which I find his credibility lacking. But this is the kind of factual determination the court needs to make in these circumstances where you have a communication that is incidental to stalking behavior, where it is part and parcel of a course of conduct directed at these individuals or any individuals that is intended to cause them emotional harm, intended to cause them fear. Didn't we have that in Relaford? I mean, we had conduct and we had communication, and the underlying basis or intent, if you will, there was definitely harassment, and it caused emotional distress. And I think that by comparing the facts in Relaford to the facts here, you mistake the level and the intensity and the number of contacts that were involved in this case. In Relaford, we have the stalker waiting from across the street and then going into the studio once, and then one lengthy, rambling, vile post. I don't want to always make a number. It shouldn't be a number. The line in the sand should not be what's the number, but rather the two that's necessary for a course of conduct. Exactly. But when you have a course of conduct that's extended over six years that involves the kind of behavior that we're dealing with here, then that website is part and parcel of that behavior. That is part and parcel of what he's trying to do. He's trying to demean and defile and denigrate my clients and defame them. We have filed a defamation case against Mr. Barnett, which we have got summary judgment on liability arising from the content of one of the signs, two of the signs. What did you say you did get? We have summary judgment. Oh, that's what I thought you did say. With regard to the content of two of the signs that they were defamatory. You know, where speech is defamatory, we have another remedy. Where it's not defamatory, we have to go to the stalking statute because of where it is part of. . . You have to be very careful. I'm having trouble just saying where you have speech that's part of the course of conduct. I mean, the Illinois Supreme Court had that in relevance. Again, I say that you have to look at the totality of the circumstances, all the facts, which is what the court did here. The court made findings of that, and it decided, and it chose to enjoin him from engaging in these electronic communications. What about the timing issue? I mean, there was this conduct, and then there was a gap, and then your clients then decided to get the new content. Mr. Barnett, who responded here, a winner is in Florida. My clients would put up with this stuff, and then he would go to Florida in November or October, or he wouldn't show up again until May or June. And each year, my clients didn't know whether he was going to be. . . Summer was Mr. Barnett. Excuse me? I said summer was Mr. Barnett. Yeah. And over time, there was this buildup of anxiety. And each year, it was like, maybe he won't come back this year. Maybe we won't have to spend the twilight years worrying about the stalker in our front yard during the summer. And then there is this incident, I think one of the key incidents, and it certainly was a key incident for the trial court, was Mr. Barnett being there in the dark when they arrived home. And I think that truly scared them. So when he arrived back after the spring, they submitted their petition for no stalking, no contact order, and proceeded from there. There was real fear. Frankly, they wished he would just go away, and they thought that each winter when he would go down to Florida for the winter, that he was just going away. But each year, he reappeared. Counsel is suggesting that the statute is unconstitutionally overbroad. Well, the overbroad argument arises from the Rutherford decision, which focuses on just a single phrase. He's anxious to and about. And the Rutherford decision excised that out. It took that phrase out of the statute, and then went on to analyze the conduct under the rest of the language of the statute. And I think that if you're going to find that the statute is unconstitutional, this is the thing. Do we even have to address that? Let's see what you would. Well, we do have to consider it in light of what evidence we can consider. Is that right? I mean, if we're going to say that there's evidence to support the no stalking order, we have to know what evidence we can consider, correct? We do. And there is a manifest way that the evidence here supports the stalking no contact order. As I've said before, we have over, you know, 80-some incidences, appearances, shadowing, surveilling, over 75 days, separate days, over a period of six years. I submit that, you know, no reasonable person would think that that would not strike fear into the people living in their home or would not cause them emotional distress. This is not normal behavior. This is not rational behavior to do this over a contract that, when you get down to the basis of it, the original contract was for $1,500. But the disputed amount was less, right? Excuse me? It was less. The amount was disputed. I got it. The unpaid amount was less. I can't remember. It was either 150 or 300. I'm like, oh, my gosh. One factor that's sort of here but never really kind of fully flushed out is the age. I mean, is that something that we should consider in the client's age with regards to all of this conduct that's taking place? I think you have to. I think the reasonable person standard requires that you look at it under all the circumstances. So are we then creating a separate reasonable person standard, saying reasonable person at a certain point in age and then everybody else? No, I don't think you're doing that. I don't think you're doing that for the very simple reason that it's only one of the circumstances you look at. You have to look at all the circumstances, and that's what the reasonable person standard says, and that's what it says in the statute that you look at the facts and circumstances that you would have known. And this person, the respondent here, would have known that they're 80-some years old, that they have health issues. He would have known that, and that's something that you have to look at when you're judging whether or not he would know or would have reason to know that his conduct would strike fear in my client's hearts or would cause them to suffer emotional distress. Is there anything else you'd like to add to the court's attention? I think that about covers it. Thank you, Your Honor. All right. Thank you. Rebuttal? Yes, Your Honor. Thank you, Your Honors, and may it please the Court again. I think to address the age of the Seagulls, I don't think that should be a relevant factor here, and I think that it definitely did weigh on the trial court, and I think that goes along with, again, the location of the picketing, that it was their residence. I think both of those things weigh heavily in the trial court's mind. But neither one should have prohibited Mr. Barnett from picketing in front of their home and certainly not from maintaining his website where he spoke out about engineering. And, Your Honors, free speech is often uncomfortable, and that's often the purpose of it. And demonstrations, picketing demonstrations, and creating websites can often be disruptive, and I think that was probably Mr. Barnett's purpose here was – I hate to interrupt you, but was there anything on the website other than we had a contract, he didn't deliver, he owes me money. I mean, was there anything talking about sex or age or – what was on the website in the record that the judge was able to hear? Your Honor, the contents of the website are in the record before this Court. As a matter of fact, the petitioners entered the contents of the website. I don't believe there was any of that kind of content on the website regarding, you know, offensive sexual language or any kind of charged language along those lines. It was geared toward the legal filings of the case. It was geared toward links to magazines that were – Mr. Barnett had made himself front and center in certain magazine articles, and Mr. Barnett was pointing those out on his website, and he was also pointing out that they continued to see those through bud engineering, continued to hold themselves out as professional engineers, when in fact they were not a licensed engineering company, and that was the crux of his website and the purpose of it. And I think that opposing counsel spoke about the McNally v. Breedman case, and I think that's a perfect juxtaposition to the facts of this case, because in McNally you had a situation where the respondent, Breedman, created a number of different online aliases so that he could e-mail the petitioner, and he communicated with her family and friends, and he did other things that were so egregious just through the electronic communications sphere that the court found that to be problematic, and that's not what we have here. We have Mr. Barnett maintaining a website that speaks out against bud engineering. If the court has no other questions, then thank you, Your Honor. Thank you for a well-argued matter. This court will take it under advisement, and we are adjourned.